Filed 5/29/20 Certified for Partial Publication 6/26/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF FRESNO,<br><br>      Plaintiff and Respondent,<br><br>           v.<br><br>FRESNO DEPUTY SHERIFF'S ASSOCIATION et al.,<br><br>      Defendants and Appellants. | F076417<br><br>(Super. Ct. No. 15CECG02375)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Samuel J. Dalesandro, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)

Messing Adam & Jasmine, Gary M. Messing, Jason H Jasmine and Lina Balciunas Cockrell for Defendants and Appellants.

Daniel C. Cederborg, County Counsel, Catherine E. Basham, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Two sheriff's deputies, through their employee organization, filed a grievance challenging their involuntary reassignment from their specialty assignments to patrol assignments.  They asserted the reassignments violated both the Memorandum of Understanding (MOU) between the County of Fresno (the county) and the employee organization, and an established past practice that deputies would not be involuntarily reassigned in the absence of disciplinary issues, documented performance issues, layoffs,

or pending disability retirement.  The administrative hearing of the grievance resulted in a decision in favor of the deputies.  The county filed a petition for a writ of mandate to reverse the decision, and the trial court granted the petition.  The employee organization and the deputies appeal.  We conclude the arbitrator who heard the matter abused his discretion because his findings were not supported by substantial evidence.  Accordingly, we affirm the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellants Greg Isaac and Kirby Alstrom are employed by the Fresno County Sheriff's Office (the department) as deputy sheriffs.  For several years prior to December 2014,[1] they held specialty assignments as detectives, with Isaac in the Vice/Intelligence Unit (vice intelligence) and Alstrom in the Agricultural Crimes Task Force (ag task force).

A specialty assignment is an assignment to a detective unit, a non-patrol function.  Specialty assignments include positions in units such as the U.S. Marshals Fugitive Task Force, the Multi-Agency Gang Enforcement Consortium (MAGEC), the ag task force, and vice intelligence.  The department fills vacancies in specialty units by sending out flyers to the entire department, which announce an opening and specify the minimum qualifications, taking applications, and conducting examinations.  Any deputy who has passed the patrol training program and is a working deputy in the courts or patrol unit is eligible to apply.

In April, Isaac's sergeant told him he was being reassigned from vice intelligence to patrol because of his tenure with the unit.  In September, Alstrom's sergeant told him he would be returning to patrol in December.  Alstrom was told he was being reassigned because some detectives had been in the specialty unit for a long time, and patrol deputies were complaining of the lack of opportunities to move into specialty assignments.

---

[1]     Subsequent references to months and dates are to months and dates in the year 2014, unless otherwise stated.

2.

Each deputy who works in patrol is assigned to a slot that designates the area, shift, and days off the deputy will have. Each year, the department has an opportunity to reconfigure its patrol shifts in the different areas it covers. It allows deputies to choose their patrol shift assignments based on seniority. These annual seniority shift sign-ups generally occur every October or November, and the shift changes go into effect every December. Isaac and Alstrom both participated in the annual seniority shift sign-ups for patrol in October and moved into their patrol assignments in December.

Both deputies testified they did not believe they could be reassigned from their specialty assignments to patrol involuntarily, absent documented performance problems or grounds for discipline. Neither deputy had disciplinary nor documented performance problems; both had received positive performance evaluations. They did not consent to reassignment and, through the deputies' bargaining representative, appellant Fresno Deputy Sheriff's Association (the association), they filed a grievance in protest.

The parties apparently agreed to have the grievance heard by an arbitrator, in lieu of the grievance committee provided for in the grievance procedure in the MOU. The issues presented to the arbitrator, as framed by the parties, were: "Did the [department] violate the [MOU] between the [c]ounty and the [association] when [Isaac and Alstrom] were involuntarily transferred from their special[ty] assignments? And if so, what is the remedy?" The arbitrator sustained the grievance, concluding that, in violation of the department's obligation to negotiate terms and conditions of employment, the department unilaterally changed its past practice of only involuntarily transferring deputies from their specialty assignments on the basis of disciplinary issues, documented performance issues, layoffs, or disability retirement. The decision ordered the department to cease and desist from involuntarily transferring deputies from their specialty assignments on other grounds. It also gave Isaac and Alstrom the opportunity to return to their specialty assignments, if they chose to do so.

3.

The MOU provided that the decision on the grievance would be reviewable by administrative writ of mandate, pursuant to Code of Civil Procedure section 1094.5.[2] The county petitioned for a writ to reverse the arbitrator's decision. After considering the administrative record of the hearing and the arguments of counsel, both written and oral, the trial court granted the petition. It ordered issuance of a writ of mandate vacating the administrative decision and denying the grievance filed by the association on behalf of Isaac and Alstrom. The association, Isaac, and Alstrom appeal the judgment.

**DISCUSSION**

**I.      Standard of Review**

When the trial court reviews the decision of an administrative body pursuant to section 1094.5, the inquiry "shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)

The appellate court applies substantial evidence review. (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469.) If a fundamental vested right was involved, and the trial court therefore exercised independent judgment, the appellate court reviews the decision of the trial court. (*Ibid.*) If the trial court "applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them." (*Ibid.*) "If the administrative findings are supported by substantial evidence, the next

---

[2]      All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

question is one of law—whether those findings support the agency's legal conclusions or its ultimate determination." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058–1059.) Here, the parties agree the case does not affect a fundamental, vested right, so we review the decision of the arbitrator and apply the substantial evidence standard.[3]

"Because [memorandums of understanding] are binding agreements between local agencies and designated employee representatives, when the meaning of a[ memorandum of understanding] is in dispute we apply de novo review, exercising our independent judgment. [Citation.] 'It is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence.' " (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1278.)

## II. Prior Proceedings

### A. Administrative proceedings

On or about September 23, the association, on behalf of Isaac, Alstrom, and "all those similarly situated" (capitalization omitted), filed a grievance alleging the deputies were adversely affected by the misapplication of (1) the MOU, and (2) a clearly established lawful past practice. The association alleged there was no written agreement regarding rotation in and out of specialty assignments. However, they asserted there was a long-standing past practice of allowing deputies to remain in their specialty assignments until they chose to leave, promoted out of the assignment, or retired. The association asserted the MOU did not allow the department to involuntarily reassign deputies out of their specialty assignments, absent documented performance issues, such as a disciplinary transfer. The department, however, believed it could transfer a deputy from a specialty

---

[3] In the trial court, the county argued the independent judgment standard applied because, as a charter county, its right to assign and reassign its employees was fundamental and vested pursuant to California Constitution, article XI, section 4, subdivision (f). The trial court found the right in issue was contractual, rather than fundamental and vested, so it did not apply the independent judgment standard. The county does not challenge that conclusion in this appeal, and cites the substantial evidence standard as the appropriate standard of review.

assignment based on being in the assignment too long; Isaac and Alstrom were the subjects of this type of transfer. The association alleged the involuntary transfers were a change from past practice that violated article 53 of the MOU, the waiver clause.

The department denied the grievance, rejecting the contention it misapplied the MOU. It asserted it had the right, under article 38 of the MOU, the management rights clause, to involuntarily move deputies and sergeants from one assignment to another, based on the department's needs, and it had done so in the past. It asserted: "The ability to move employees from one assignment to another is critical to giving employees the necessary job knowledge and experience to promote the growth and development of our employees and the [department]." It provided a list of some who had been involuntarily reassigned.

The arbitrator heard the matter over the course of two days. In his decision, he identified the baseline issue as one of contract interpretation—interpreting the application of articles 38 and 53 of the MOU. He found "based on the four corners of the MOU the [a]ssociation has been persuasive in [its] contention that the [department] violated the terms of the MOU. This is due to the fact that the [d]epartment had stepped over the line in [its] interpretation of the MOU, when [it] determined that [Isaac and Alstrom] could be involuntarily transferred even though they did not want to leave the [specialty] assignments." The arbitrator concluded there was a longstanding past practice that involuntary transfers out of specialty assignments were limited to transfers based on discipline, documented performance issues, layoffs, or pending disability retirement. The arbitrator sustained the grievance, concluding: "based on the evidence the arbitrator's finding is that the [d]epartment violated Government Code Section 3505 and [a]rticle 53 of the MOU, when it unilaterally changed the past practice of involuntar[il]y transferring the deputies from their special[ty] assignments based on criteria other than that of disciplinary issues, documented performance issues, layoff[s,] or disability retirement."

6.

## B. Trial court proceedings

The county petitioned the trial court for an administrative writ of mandate overturning the decision of the arbitrator. It asserted the arbitrator abused his discretion, "because the evidence submitted does not support the finding that [the c]ounty misapplied any section of the MOU or acted contrary to any lawful past practice." Additionally, the arbitrator's decision constituted an error of law, because the arbitrator "failed to interpret [a]rticles 38 and 53 of the MOU in a manner that harmonized the two provisions."

The trial court granted the petition. It noted that, while the arbitrator identified the baseline issue as one of contractual interpretation, he "devoted almost no discussion to the relevant MOU provisions." The trial court analyzed articles 38 and 53 of the MOU. It concluded article 38 granted the department "the power to assign, reassign, and determine the procedures and standards for reassignment of employees." Article 38 did not limit the department's power to reassign employees to situations in which there was a performance, disciplinary, or similar justification for the reassignment. Article 53 precluded unilateral changes in matters included in the MOU during its term. It waived the parties' obligation to meet and confer over matters included in the MOU or within the scope of negotiation during the term of the MOU; it did not limit the county's rights as set out in the MOU.

Regarding the issue of past practice, the trial court noted the arbitrator did not identify any testimony or other evidence that supported his conclusion that the parties had a past practice of limiting involuntary transfers out of specialty assignments to situations in which the transfer was due to disciplinary reasons, documented performance issues, layoffs, or pending disability retirement. It reviewed the evidence in the administrative record and applied the test for determining when a past practice has been established by the evidence. A binding past practice must be unequivocal, clearly enunciated and acted upon, and readily ascertainable over a reasonable period of time as a fixed and

7.

established practice accepted by both parties. The trial court concluded the administrative record did not contain substantial evidence supporting the arbitrator's finding that there was an established past practice of making involuntary transfers only in the limited situations he described. Further, it decided the arbitrator exceeded his jurisdiction by concluding the department violated Government Code section 3505. The arbitrator did not discuss the statute in his decision; the issue was not raised in the grievance and was not properly before the arbitrator.

### C.    Grievance

Article 49 of the MOU sets out the employee grievance procedure, pursuant to which the association and the deputies filed their grievance. It provides, in pertinent part:

> "A grievance is a complaint relating to any phase of an employee's employment or working conditions which the employee believes has been adversely affected because of:

> "A misapplication of a Memorandum of Understanding, Ordinance or Resolution of the Board of Supervisors, or of the written policies, administrative orders, or a clearly established lawful past practice of a department, relating to the employment of the individual .…"

The grievance in this case alleged a misapplication of both the MOU and a past practice of the department. We analyze both allegations.

## III.    Violation of the Express Terms of the MOU

Under the Meyers-Milias-Brown Act (MMBA; Gov. Code, §§ 3500–3511),[4] public employees have the right to be represented by employee organizations in all

---

[4]    We grant appellants' unopposed requests for judicial notice, filed May 7, 2018, and November 27, 2018, and the county's unopposed request for judicial notice filed September 4, 2018, all of which request judicial notice of Public Employment Relations Board (PERB) decisions applying the MMBA. The MMBA "governs collective bargaining and employer-employee relations for most California local public entities, including cities, counties, and special districts." (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077.) PERB is vested with exclusive jurisdiction over most alleged violations of the MMBA, although peace officers are exempt from that jurisdiction. (*Coachella Valley Mosquito & Vector Control Dist.* at p. 1077 & fn. 1; Gov.

matters of employer-employee relations.  (Gov. Code, §§ 3502, 3503.)  "The MMBA applies to local government employees in California.  [Citation.]  'The MMBA has two stated purposes:  (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations.  [Citation.]  To effect these goals the act gives local government employees the right to organize collectively and to be represented by employee organizations [citation], and obligates employers to bargain with employee representatives about matters that fall within the "scope of representation" [citations].'  [Citation.]  The duty to meet and confer in good faith is limited to matters within the 'scope of representation ….' "  (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630, fn. omitted.)  The scope of representation includes wages, hours, and other terms and conditions of employment.  (Gov. Code, § 3504.)

The public agency employer must meet and confer in good faith with the employee organization on matters within the scope of representation prior to arriving at a determination of policy or a course of action.  (Gov. Code, § 3505.)  If the public agency and the employee organization reach a tentative agreement, and the governing body of the public agency adopts the tentative agreement, "the parties shall jointly prepare a written" MOU.  (Gov. Code, § 3505.1.)  Under the MMBA, an MOU adopted by the governing body of a public agency becomes a binding and enforceable contract that neither party may change unilaterally.  (*City of Los Angeles v. Superior Court* (2013) 56 Cal.4th 1086, 1092–1093.)

MOU's are binding contracts and are interpreted in accordance with the general rules of contract interpretation.  (*National City Police Officers' Assn. v. City of National City*, *supra*, 87 Cal.App.4th at pp. 1278–1279.)  The goal of contract interpretation is to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as

---

Code, § 3511.)  Accordingly, PERB's past decisions are relevant to interpretation and application of the MMBA.

it is ascertainable and lawful. (*Id*. at p. 1279.) " 'Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' " (*Hervey v. Mercury Casualty Co*. (2010) 185 Cal.App.4th 954, 961.) No extrinsic evidence was offered regarding the meaning the parties intended be given to articles 38 and 53 at the time of contracting. Consequently, we determine the meaning of these provisions de novo.

The arbitrator did not interpret the language of the MOU. Although he concluded, "based on the four corners of the MOU," that the department violated the MOU by involuntarily transferring Isaac and Alstrom, when they did not fall within any of the categories he deemed permissible and they did not want to leave their specialty assignments, he did not identify any provision of the MOU prohibiting involuntary transfers. The trial court correctly interpreted the language of the MOU, concluding article 38 conferred on the county the right to reassign its employees and article 53 did not limit that right.

Article 38 of the MOU, the management rights clause, provided, in part:

"A. All [c]ounty rights, powers, functions, and authorities except as expressly abridged by this MOU shall remain vested in the [c]ounty whether or not they have been exercised in the past. [¶] … [¶]

"H. The rights, powers, and authorities of the [c]ounty include, but are not limited to, the sole and exclusive right to: [¶] … [¶]

"4. select, train, direct, assign, demote, promote, layoff, dismiss its employees; [¶] … [¶]

"7. relieve its employees from duty or reassign employees because of lack of work or for other reasons the [c]ounty considers legitimate; [¶] … [¶]

10.

"9. determine and change the method, means, personnel, and standards by which [c]ounty operations are to be conducted; [¶] … [¶]

"13. make rules and regulations pertaining to employees consistent with this MOU; …"

Thus, on the face of the MOU, the county, with the agreement of the association, reserved to itself all rights not expressly abridged by other provisions of the MOU; the MOU specifically granted the county the "sole and exclusive right" to assign its employees, and to reassign them for reasons the county considered legitimate.

Article 53 of the MOU, the waiver clause (also referred to as the zipper clause), provided:

> "The parties acknowledge that, for the life of this MOU, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter pertaining to or covered by this MOU, or any other matter within the scope of negotiations, notwithstanding any other provisions of law to the contrary. Furthermore, the parties agree that neither party shall lobby the board of the other party regarding making changes on matters within the scope of negotiations that could occur during the term of the MOU."

" '[T]he general purpose of a zipper clause is to "zip up" the collective bargaining agreement. It insulates both parties to the agreement from a demand by the other party to reopen negotiations with the intent of modifying or adding to the current contract terms or otherwise changing the status quo.' It does not insulate the unions (or the City) from timely requests to begin bargaining about the next [memorandum of understanding]." (*City of Fresno v. People ex rel. Fresno Firefighters* (1999) 71 Cal.App.4th 82, 98.) Thus, once the parties have agreed on the provisions of the MOU, the zipper clause locks them in place for the duration of the agreement. Neither party can compel the other to renegotiate the MOU's provisions or to negotiate additional provisions until it is time to negotiate a new MOU. Because any changes to the agreement must be negotiated, and they cannot be negotiated during the term of the MOU, the MOU cannot be unilaterally changed during its term.

11.

As the trial court observed, the management rights clause granted the county the right to assign and reassign deputies, without limiting the reassignment right to cases of discipline, poor performance, and the like. Consequently, the department did not violate the express written terms of the MOU by reassigning Isaac and Alstrom involuntarily, even in the absence of disciplinary issues, documented performance issues, layoffs, or pending disability retirement.

Appellants argue that the MOU reserved to the county its reassignment rights "except as expressly abridged by this MOU" (article 38, section A), and the zipper clause expressly abridged those rights. We reject this argument. The zipper clause did not contain any provisions limiting the county's reassignment rights. Further, the function of a zipper clause is not to abridge or alter the substance of any of the other provisions to which the parties agreed in the MOU. Once an agreement is reached on the other provisions, the zipper clause locks them in for the duration of the MOU's term. It prevents either party from unilaterally changing those provisions and from compelling renegotiation of the agreed upon provisions, unless the parties agree to reopen negotiations. It does not change the substance of the other provisions of the MOU. The zipper clause in the parties' MOU did not change or limit the scope or application of the rights actually agreed upon in article 38.

Consequently, we conclude the arbitrator incorrectly interpreted the MOU when he determined that, "based on the four corners of the MOU the [a]ssociation has been persuasive in [its] contention that the [department] violated the terms of the MOU … when [it] determined that [Isaac and Alstrom] could be involuntarily transferred even though they did not want to leave the [specialty] assignments." Appellants did not establish a violation by the county of the express terms of the MOU.

## IV.  Violation of Past Practice

The second ground for appellants' grievance was their allegation that the parties had established a past practice that deputies would not be reassigned out of their specialty

assignments except for specified reasons, and that the practice was unilaterally changed by the department when Isaac and Alstrom were reassigned to patrol. The arbitrator found in their favor on that claim.

A public agency may not "[r]efuse or fail to meet and negotiate in good faith with a recognized employee organization." (Gov. Code, § 3506.5, subd. (c).) "An employer's unilateral change in terms and conditions of employment within the scope of representation is, absent a valid defense, a per se refusal to negotiate .…" (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 934.) An existing and acknowledged practice affecting conditions of employment has the same dignity as an existing agreement, when it is sufficiently widespread and of sufficient duration. (*Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 817.) Thus, an employer's unilateral change in a well-established practice may violate its duty to meet and negotiate in good faith with the employee organization prior to changing the terms and conditions of employment.

"[U]nder standards established by PERB, to prevail on a complaint of illegal unilateral change, the union must establish: (1) the employer breached or altered the parties' written agreement, *or own established past practice*; (2) such action was taken without giving the exclusive representative notice or an opportunity to bargain over the change; (3) the change is not merely an isolated breach of the contract, but amounts to a change of policy, i.e., the change has a generalized effect or continuing impact on bargaining unit members' terms and conditions of employment; and (4) the change in policy concerns a matter within the scope of representation." (*California State Employees' Assn. v. Public Employment Relations Bd.*, *supra*, 51 Cal.App.4th at p. 935, italics added.) The issue argued by the parties in this appeal is whether substantial evidence supports the arbitrator's conclusion on the first element: that the department unilaterally altered the parties' established practice of not involuntarily reassigning deputies from their specialty assignments, unless the reassignment was the result of

discipline, documented performance issues, layoffs, or pending disability retirement. This encompasses two subissues: (1) whether substantial evidence supports the implied finding that such an established practice existed; and (2) whether substantial evidence supports a finding that the department unilaterally changed the past practice when it reassigned Isaac and Alstrom.

### A. Alleged trial court error

Appellants argue that the trial court failed to look for evidence supporting the administrative decision and substituted its judgment for that of the arbitrator. The argument is moot. In this appeal, our review standard is identical to that of the trial court. (*Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610.) We review the administrative decision to determine whether substantial evidence supports the findings, and whether the findings support the decision. (§ 1094.5, subd. (b).) "Possible misapplication of the review standard below has no bearing on the outcome here." (*Sierra Club*, at p. 611.)

### B. Effect of the terms of the MOU

The county argues that, when the language of an MOU is clear and unambiguous, it is unnecessary and inappropriate to examine past practice (citing *Marysville Joint Unified School District* (1983) PERB Dec. No. 314 [7 PERC ¶ 14163] (*Marysville*)). It asserts the MOU was clear in setting out the county's right to assign and reassign deputies, so the arbitrator should not have considered past practice in interpreting the contract.

In *Marysville*, the collective bargaining agreement "entitled teachers to 'one duty free lunch break of no less than 30 minutes each day.' " (*Marysville*, *supra*, PERB Dec. No. 314 at p. 8 [7 PERC ¶ 14163, p. 8].) The consistent practice of the district had been to allow teachers a 55-minute duty-free lunch break. During a budget crisis, the district assigned teachers to supervise students during the lunch period, reducing their duty-free lunch break to 30 minutes. (*Id.* at pp. 3–4.) The teachers challenged this as a unilateral

change in their hours. The PERB decision stated: "An employer violates its duty to negotiate in good faith when it unilaterally changes an established policy affecting a negotiable subject matter without affording the exclusive representative a reasonable opportunity to bargain. [Citations.] Established policy may be embodied in the terms of a collective agreement [citation] or, where a contract is silent or ambiguous as to a policy, it may be ascertained by examining past practice or bargaining history. [Citations.] However, where contractual language is clear and unambiguous, it is unnecessary to go beyond the plain language of the contract itself to ascertain its meaning." (*Id*. at pp. 8–9.) Because the provision for a duty-free lunch break of no less than 30 minutes was unambiguous, PERB concluded the district acted consistently with its contractual obligations. Further, "[t]he mere fact that an employer has not chosen to enforce its contractual rights in the past does not mean that, ipso facto, it is forever precluded from doing so. [Citation.] Accordingly, we find that the Association, by agreeing to a contractual provision which plainly permitted the District to grant teachers a lunch period of 30 minutes or longer at its discretion, waived its right to negotiate over the District's reduction of the lunch period to 30 minutes." (*Id*. at p. 10.)

In *Oakland Unified School District* (2005) PERB Decision No. 1770 [29 PERC ¶ 143], the school district, after negotiating a new collective bargaining agreement with the school employees' association, eliminated its police force and entered into a contract in which it agreed to pay the city to provide police protection. (*Id*. at p. 3) The school employees' association challenged the change as subcontracting of bargaining unit work to a third party, which the district failed to negotiate. The district claimed its action was authorized by the management rights clause in the collective bargaining agreement. In that clause, the district "retain[ed] the exclusive right to manage the school district including, but not limiting, its rights to determine the methods, means and personnel by which the District operations are to be conducted; and to determine the missions and functions of each of its departments, sites, facilities and operating units, …" (*Id*. at

15.

p. 48.) A prior PERB decision had determined that a broadly based management rights clause would not be construed as a waiver of statutory bargaining rights, because any waiver of a right to bargain was required to be clear and unmistakable. (*San Jacinto Unified School District* (1994) PERB Dec. No. 1078, p. 18 [19 PERC ¶ 26036, p. 18].) The management rights clause in *Oakland Unified School District* did not specifically address either subcontracting or police services. PERB concluded the management clause before it was "a generally worded clause without reference to subcontracting or police services and therefore [did] not support the unilateral action by the District." (*Oakland Unified School District*, at p. 9.)

In *County of San Bernardino (Office of the Public Defender)* (2015) PERB Decision No. 2423-M [39 PERC ¶ 165], PERB rejected the public defender's argument that past practice trumped the wording of the memorandum of understanding, stating: "[W]hen parties' past practice conflicts with the wording of their [collective bargaining agreement], each party 'still maintains the right to adhere to and enforce the contractual language of the [collective bargaining agreement].' " (*Id*. at p. 53.)

Thus, when the action of the employer that is being challenged is directly addressed in the MOU, the parties are bound by the terms of the written agreement even when the employer has not exercised its rights previously. When the employer's action is addressed in an ambiguous provision, evidence of a past practice may assist in interpreting the ambiguous provision. When the MOU does not specifically address the situation, a past practice that is not inconsistent with the terms of the MOU may be enforceable if it is sufficiently established.

In this case, as in *Oakland Unified School District*, the employer relies on a management rights provision in the MOU as authorizing the challenged change in working conditions. Unlike the general management rights provision in *Oakland Unified School District,* which did not mention subcontracting or police services (the changed working conditions), the management rights clause in this case (article 38) specifically

granted the county the right to assign and reassign employees. Although the clause was not as specific to the challenged conduct as the provision for a 30-minute lunch period in *Marysville,* article 38 did expressly permit the county to assign and reassign employees for reasons it considered legitimate, and to determine the procedures and standards for reassignment. Involuntarily reassigning deputies, even in the absence of disciplinary issues, documented performance issues, layoffs, or pending disability retirement was consistent with article 38. The association, by agreeing to the management rights clause, agreed that the county had the sole and exclusive right to assign and reassign employees for reasons it considered legitimate, and to determine the procedures and standards for reassignment. The department's action in reassigning Isaac and Alstrom was consistent with these terms of the MOU. By granting the county this authority to reassign employees, the association made a clear and unmistakable waiver of its right to renegotiate the grounds on which the county was permitted to reassign its employees, and the procedures for doing so, during the term of the MOU.

We conclude the association failed to establish that the MOU was ambiguous or silent regarding reassignment of employees, and therefore there was no need to consider the past practices of the parties to determine whether the county violated its obligation to negotiate a change in practice.

### C. Existence of a past practice

#### 1. Legal requirements for establishing a past practice

Even if we were to find that the MOU was ambiguous and the arbitrator was permitted to consider past practice in determining whether the department failed to negotiate prior to changing its reassignment practices, appellants failed to demonstrate that the alleged past practice existed and was unilaterally changed by the county.

#### 2. Evidence presented

Isaac testified he was a deputy sheriff and had been employed by the department for 16 years. He was assigned to vice intelligence (a specialty assignment) for

17.

approximately eight years, until he was reassigned to patrol in December. He had no record of discipline and no documented performance issues. On April 4, after seeing a flyer announcing an available position in MAGEC, he emailed to express interest in applying. He notified his sergeant that he had applied, because it was normal protocol for a deputy to let the supervisor know when the deputy applied for a position in another unit. Isaac told the sergeant he was not unhappy in vice intelligence, and, if he did not obtain the position in MAGEC, he would be happy to continue in vice intelligence. After discussing the matter with his wife, however, Isaac informed his sergeant on April 7, that he was going to withdraw his application to MAGEC and remain in vice intelligence. On April 8, his sergeant told him it would not be a good idea to withdraw his application to MAGEC because their lieutenant had been tasked with removing a deputy and had chosen to remove Isaac. The sergeant said Isaac would be replaced; the reassignment was due to Isaac's tenure in the unit, even though other deputies had been there longer. Isaac was shocked, because he had been told he was doing a good job. The sergeant told Isaac he needed to find a new home, and the sergeant would have nothing but good things to say to other supervisors about Isaac, if he applied elsewhere.

Isaac felt he had no option but to leave his name in for MAGEC. Patrol was shorthanded, however, and the department did not fill the position in MAGEC. In June, Isaac's sergeant asked if he had found a new home yet. Because he had not, the sergeant told him he needed to choose an area for his patrol assignment, or else the sergeant would have to choose one. Isaac was told he would be moved less than two weeks later. He called the association for help in challenging the reassignment. Isaac continued in his specialty assignment until, after discussions with his lieutenant and being told he did not have a choice, he selected a patrol assignment in October, during the normal seniority shift signups. He began his patrol assignment in December.

Isaac testified he did not think he could be transferred without disciplinary or performance issues. He had heard of deputies being bullied out of their specialty

18.

assignments by being threatened with a transfer or a schedule change or something, but his situation was different. The culture around the department was that, if the supervisor told a deputy to leave the specialty unit, it would happen whether it was voluntary or not. Many deputies left "voluntarily" under pressure; Isaac never heard of anyone being transferred involuntarily without discipline or performance issues. Isaac then admitted, however, that when deputies left under pressure, he considered it involuntary. Isaac believed his position was different because he never agreed to leave vice intelligence.

Robert Kandarian testified he was captain of the detective bureau of the department. The deputies working under him were in specialty assignments. He was in Isaac's chain of command while Isaac was assigned to vice intelligence. Isaac's lieutenant requested that Isaac be transferred because he was not a good fit in the unit, and he did not get along well with the others; Captain Kandarian approved Isaac's transfer. Isaac was not given any choice about the transfer. Initially, Isaac was given a deadline by which to move. After discussing the matter with the sheriff and undersheriff, however, they decided to wait until the normal annual shift sign-ups and allow Isaac to sign up for a shift by seniority. Isaac signed up for a patrol slot.

Alstrom testified he had been working for the department for 23 years, almost all of that time as a deputy. He held a specialty assignment in the ag task force from 1999 to 2003; he voluntarily returned to patrol for four years, then was again assigned to the ag task force for about seven years, until he went back to patrol in December. He enjoyed his ag task force assignment; he received good evaluations and had no disciplinary or performance issues.

The leadership of the ag task force changed in 2014. Several deputies went to the new sergeant and asked if they were all going to be able to stay; the sergeant said he had no plans to change the unit at that point. Then, on September 11, the sergeant told Alstrom he was going to be returning to patrol in December. The reason given was that some detectives had been in their positions a long time, and some patrol deputies were

19.

complaining that there were no positions for them to move into. So, the department was going to remove some of the detectives who had been there a long time and allow new ones to move into those positions. The annual seniority shift sign-ups were delayed because of the grievance Alstrom and Isaac filed. The patrol deputies wanted to know what their assignments would be for the next year, so Alstrom asked Eric Schmidt, president of the association, to try to arrange to have the shift sign-ups go forward, while the grievance was fought in the background. Alstrom was forced to leave his assignment; he did not agree. Alstrom explored another specialty position but learned someone else had already gotten the job. He took the transfer to patrol but maintained his grievance.

Alstrom testified that, prior to his reassignment, he had heard of deputies being bullied out of specialty assignments. He explained that, when a new sergeant or lieutenant came in and wanted to make his or her own team, the sergeant would tell a deputy it was time to move on, the deputy had been there too long. If the deputy resisted, there were things the supervisor could do to push the deputy out, such as give bad write-ups or poor evaluations; or the supervisor could help the deputy find a new position. Alstrom's experience was different from that situation because he never agreed to the reassignment, but instead filed a grievance.

Alstrom was aware of situations in which a deputy was told to leave and did leave. In cases when a supervisor told a deputy it was time to find a new home, the deputy was being forced out. If the deputy did not find another specialty assignment, he or she would be transferred to patrol or courts. When a deputy was told to leave, it was not the deputy's choice to leave, but normally the deputy would capitulate and go to the new assignment. Alstrom agreed with counsel's definition of capitulation: the deputy went along with what he or she was told to do and did not fight it or file a grievance. Alstrom's situation was different because those who capitulated ultimately agreed to their transfers; he never agreed, and he filed a grievance.

Ryan Hushaw testified he was a sergeant with the department, assigned to the ag task force. On September 11, Sergeant Hushaw told Alstrom he would be signing up for patrol in December; this meant Alstrom would be leaving the ag task force. Alstrom seemed surprised, and they discussed his future options. Alstrom expressed interest in vice intelligence, and Sergeant Hushaw said he would put in a good word for Alstrom with the supervisor there.

Sergeant Hushaw told Alstrom the reason for the transfer was because the ag task force had become stagnant. The deputies in the unit did not want to leave, and deputies outside it complained of not having an opportunity to get in. Alstrom had been there the longest, so it made sense for him to leave. Alstrom expressed a desire to stay in the ag task force, but Sergeant Hushaw did not give Alstrom any choice in the matter.

James Lyman testified he had been a deputy with the department for 25 or 26 years. He worked 14 years in MAGEC. He had no discipline issues, just traffic accidents. In about 2007, Lyman's supervisor told him he had been there too long, and he needed to move. His supervisor did not move him then. In 2014, Lyman's sergeant asked if he planned to retire in MAGEC. When he indicated he did, the sergeant told him he would not retire in MAGEC. Lyman understood that to mean he was being moved out of MAGEC; he was not given an option. The next day, Lyman told his supervisor he would put in a transfer. He asked to return to patrol. At the time, he believed he could be reassigned involuntarily only if the department needed him in a certain part of the department because of his deputy IV status.

Brandon Pursell testified he was a lieutenant with the department. He was a sergeant with MAGEC when Lyman was there. Lieutenant Pursell asked Lyman how much longer he planned to stay in MAGEC. Lyman said he was planning to stay the remainder of his career and retire from that position. Lieutenant Pursell told Lyman he wanted to remove Lyman from the unit but would give him the opportunity to find another position on his own. Lieutenant Pursell made it clear Lyman would be moved

21.

either way. Lyman was not happy to hear this; he did not want to leave MAGEC. He went back to patrol, outside the normal seniority shift sign-ups.

Schmidt, the association president, testified that Lyman was not reassigned involuntarily; he put in a request to be returned to patrol.

Scott Plann testified he had been a deputy with the department for 14 years. From September 2005 to November 2008, he was assigned to the ag task force. He had no discipline or documented performance issues. In 2008, there was a new sergeant in the ag task force. Plann took leave when his wife had a baby and, when he returned, the sergeant told him it was time for him to leave the unit. Plann said he was not ready to leave yet, and the sergeant said if Plann did not go, the sergeant would make his life miserable. Plann ultimately went back to patrol. It was not his choice to do so; he wanted to stay in the ag task force for the foreseeable future, but he decided not to take on the extra stress of fighting the reassignment. It was not a voluntary transfer.

Sergeant Hushaw, who was assigned to the ag task force, testified Plann was removed from his position in the ag task force involuntarily before Sergeant Hushaw was assigned to the unit. Plann told Sergeant Hushaw his sergeant did not like him and wanted him out of the unit. Plann went back to patrol. He told Sergeant Hushaw he wanted to return to the ag task force. Captain Kandarian also testified Plann was transferred out of his specialty assignment involuntarily.

Lieutenant Pursell testified Plann was told he needed to leave his specialty assignment. Plann told Lieutenant Pursell he believed he was replaced because the sergeant wanted to put a friend in the position. Plann did not tell Lieutenant Pursell he left voluntarily because of family issues; he said he left involuntarily.

Greg Gularte testified he was a captain with the department, supervising the patrol bureau and the operations support bureau. He testified that, in 2012, deputy Jon Sims was moved from a specialty assignment as a robbery property detective to patrol. Sergeant Irwin recommended to Captain Gularte, who was then a lieutenant, that Sims be

22.

moved; Gularte approved the move. Sims did not request the reassignment, and he had no disciplinary or documented performance issues. He was moved because Sergeant Irwin was restructuring the team and it was time for Sims to go. Sims was not given the option of staying. He returned to patrol prior to the regular patrol seniority shift sign-ups, to a vacant position that fit his schedule.

According to Schmidt, the association president, Sims was just wrapping up a large case and was tired; there was a new sergeant in his unit, and he decided to go back to patrol when it came time for shift change. Sims also coached football, and his commitment to that was his priority at the time. Schmidt represented that Sims asked for the transfer.

Captain Gularte testified Mike Quintanilla was another robbery property detective who was asked to move back to patrol. Quintanilla was told the team was being restructured and it was time for him to leave. He was not given the option of staying. If he had not signed up for a patrol assignment, he would have been moved anyway. Captain Gularte explained that being "asked" to leave was preparatory; it meant the deputy was told he was being transferred, but was given an opportunity to sign up for a patrol position during regular seniority shift sign-ups, rather than being arbitrarily transferred into a vacant position that might not work for the deputy. The deputy was going to be transferred regardless of whether he signed up for a patrol slot or not.

Captain Gularte further testified that, in 2012, Sergeant Irwin told Anthony/Carlos Rodriguez,[5] a deputy assigned to the Boating Enforcement Unit, that he needed to move back to patrol. Rodriguez was transferred because he had been there for a period of time and the team was being changed; the transfer was also for his own development. Rodriguez had been asked to leave the prior year but had been allowed to stay. This time he had to leave; he was not given the option of staying. He signed up for patrol.

---

[5]     Captain Gularte testified Rodriguez used two first names interchangeably.

23.

Captain Gularte identified Steve Valassis as another deputy who was asked to leave his specialty assignment several years ago.

Eric Schmidt testified he was a deputy with the department, assigned as president of the association since 2008. His understanding was that the department had authority to transfer a deputy from a specialty assignment for discipline, for documented performance issues, when the deputy requested a transfer to a different specialty assignment, when the deputy was promoted, when the position was no longer funded, or when the deputy retired. If a new supervisor did not want a deputy in the unit any longer, the supervisor could, without involuntarily transferring the deputy, encourage the deputy to leave. If the deputy refused, there was nothing the supervisor could do. Schmidt testified he talked with Captain Jennifer Horton, who was patrol captain prior to Captain Gularte, and Captain Horton stated she was not going to move people involuntarily, if there was no disciplinary issue and the person's job performance was correct.

Schmidt identified deputies who had been reassigned out of their specialty assignments at their own request, for administrative reasons, or due to discipline, loss of funding for the position, or reduction in the unit due to lack of work. Schmidt acknowledged that some deputies were told it was time for them to move on and they might want to find another assignment. On some occasions, when a new sergeant, lieutenant, or captain came to a specialty unit, that new supervisor would want to make changes to the unit and would tell a deputy he or she needed to find another home, that is, another specialty assignment, or go back to patrol. The deputies Schmidt knew of took the hint and either went back to patrol or put in for a different specialty assignment. What could happen if a deputy did not take the hint was that the deputy could be blackballed; the deputy could be labeled a whiner, a complainer, and not a team player. The deputy could also be threatened with write-ups and discipline, which would follow the deputy in the future. A deputy could also be bullied into leaving a specialty

assignment by changing the deputy's hours, schedule, or the type of crime to which the deputy was assigned.

Schmidt testified Isaac and Alstrom were forced out of their specialty positions; they were told they were going back to patrol. They said they liked their positions and did not want to go back to patrol. Their supervisors told them they had no choice and had to go back to patrol. They never agreed to the reassignments.

Schmidt further testified Isaac and Alstrom were told in September that they needed to leave the teams they were on. Seniority shift sign-ups for patrol took place roughly in October, so they had a period of time to look for vacant positions. Like any deputy told by a supervisor that the deputy needed to leave the specialty assignment, Isaac and Alstrom had the option of looking for another available specialty assignment.

Schmidt testified that, before the current grievance was filed, if a deputy was told he needed to leave an assignment, but he did not wish to go, he had a right to stay in that assignment. He based that conclusion on the fact that no deputy, prior to Isaac and Alstrom, had ever come to him, as the employee representative, and complained that the deputy was being forced out and did not want to go.

Captain Gularte testified the department has the right to assign and transfer deputies for the efficiency of the department. Deputies can be reassigned whether they have disciplinary or documented performance issues or not. As a supervisor, Captain Gularte had told deputies in specialty assignments that they needed to leave those assignments. Prior to Isaac and Alstrom, no deputy had filed a grievance because of a reassignment out of a specialty assignment.

Rick Ko testified he was a lieutenant with the department, assigned as watch commander. In that position, he was the sheriff's representative on nights and weekends, when the executive staff is absent; during the day he oversees day-to-day patrol and field operations. In the past, he was the special investigations commander in the Special Investigations Division, which included vice intelligence and a number of other units.

25.

Lieutenant Ko testified there was a process, through disciplinary proceedings and evaluations, to remove deputies from specialty units if the supervisor was unhappy with a deputy's work. If there was no disciplinary reason to remove a deputy, Lieutenant Ko would want diversity in the unit and would not remove a deputy simply because he did not like the deputy.

It was Lieutenant Ko's understanding, from conversations with the former undersheriff, that he could not transfer a deputy out of a unit if the deputy did not want to leave, unless there was cause. A deputy could be reassigned to another area, however, if the deputy had a special skill that was needed there, such as a pilot being assigned to air support; Lieutenant Ko would want the employee to agree to the reassignment though, because he would not want someone who did not want to be there doing something dangerous. Additionally, often when a new sergeant moved into a unit, the sergeant would want to put his own signature on the unit or move deputies he had worked with before into the unit. Lieutenant Ko's philosophy was that the sergeant should wait and, if in six months or a year a deputy in the unit was not a good fit, the sergeant could tell the deputy he might fit better somewhere else. The deputy would usually transfer out on his own. If the deputy did not, the sergeant might document poor performance if that was an issue, or make the deputy's life so miserable the deputy would transfer. Whether that was a voluntary or involuntary transfer was a matter of perception; the department would call it voluntary, but in reality it would be involuntary.

Lieutenant Ko acknowledged that other supervisors have told deputies in their specialty units that they needed to find a new home, and the deputies then left the units. He testified no one made Isaac's and Alstrom's lives miserable to get them to transfer. They were just told they were out, and they were moved.

Lieutenant Pursell testified he understood counsel's definition of bullying— making someone's life miserable so the person would leave a specialty assignment—but

he had not heard of that happening in the department and knew of no specific instances of it.

### 3.    Substantial evidence standard

When a party challenges the evidentiary support for administrative findings, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."  (§ 1094.5, subd. (c).) "To be 'substantial,' evidence must be reasonable in nature, credible, and of solid value." (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 409–410.)  On appeal, we do not reweigh the evidence.

" 'The "in light of the whole record" language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record.  [Citation.]  Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence.  [Citation.]'  [Citations.]  That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's.  [Citation.]  'It is for the agency to weigh the preponderance of conflicting evidence [citation].  Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency.' "  (*Sierra Club v. California Coastal Com.*, *supra*, 12 Cal.App.4th at p. 610.)

### 4.    Evidence of past practice

PERB has adopted a rule that, to be a binding past practice, the practice " 'must be (1) unequivocal; (2) clearly enunciated and acted upon; and (3) readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties. [Citation.]  [PERB] has … described a valid past practice as one that is "regular and consistent" or "historic and accepted." ' "  (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1291.)  Pursuant to the terms of the MOU, "[i]f a

grievance is alleged relating to a [clearly established lawful] past practice … , the grievant must first establish that practice has existed." Thus, in the administrative proceeding, the burden was on the association to establish the existence of the alleged past practice.

### a. Unequivocal and clearly enunciated

One of the problems with the claim that a past practice existed was that appellants could not clearly enunciate an unequivocal practice that they contended was unilaterally changed by the department. In the grievance, the association described the alleged past practice as a long-standing practice of allowing deputies to stay in their specialty units until they chose to leave, promoted out, or retired. The grievance also alleged the MOU (rather than any past practice) did not permit the department to "move deputies when it has not documented performance issues, etc., i.e., disciplinary transfer."

In its closing brief in the administrative proceeding, the association redefined the alleged past practice as "an established past practice of not involuntarily transferring a deputy out of a special[ty] assignment unless there was a disciplinary matter, documented performance issues, a layoff[,] or pending disability retirement. In other words, once a deputy earns a special[ty] assignment, the position is his or hers until such time as the deputy voluntarily leaves it or is transferred under the aforementioned limited circumstances." The evidence, however, did not support such limited circumstances as the only grounds for involuntary transfers. Even Schmidt, the president of the association, admitted there were occasions when a deputy was told it was time to move on or to find another home, and the deputy complied.

The association conceded, in its closing brief in the administrative proceeding, that the evidence established another situation in which deputies could be transferred: "where the [d]epartment either makes life miserable for the deputy or tells the deputy that she/he needs to 'find a new home,' usually when new supervisors come into the detective unit." According to the association, all the deputies before Isaac and Alstrom "would capitulate

28.

to the 'bullying' and agree to the transfer."  The association recognized that, in reality, such transfers were involuntary, because the deputy was told to move when he or she did not want to move.  The association asserted, however, that "the affected deputies capitulated, or at least chose not to challenge this type of transfer.  [Citation.] Accordingly, for the purposes of this arbitration, transfers resulting from being bullied should be considered voluntary."

Thus, by the association's own admission, the past practice it alleged—no involuntary transfers except for discipline, documented performance issues, layoffs, or pending disability retirement—only existed if we redefine the terms "voluntary" and "involuntary" to fit its theory.  Appellants would have us redefine the term "involuntary" to exclude admittedly involuntary transfers similar to the transfers that affected Isaac and Alstrom (where a deputy was told he or she was being reassigned and had no choice in the matter), in an attempt to distinguish them from the transfers of Isaac and Alstrom.

The common meaning of the word "voluntary" is:  "proceeding from the will : produced in or by an act of choice" or "not constrained, impelled, or influenced by another."  (Webster's 3d New Internat. Dict. (1981) p. 2564.)  "Involuntary is defined as "not subject to control of the will : independent of volition."  (*Id*. at p. 1191.)  Substantial evidence did not support a conclusion that those who "capitulated" when told they were being reassigned were transferred by choice, not constrained, impelled, influenced, or controlled by the will of another.  The testimony was uniform that those deputies who were told to find a new home, or were told they were being reassigned, did not choose to leave and were not given the choice of leaving or staying.

Following appellants' reasoning to its logical conclusion, excluding situations involving disciplinary actions, documented performance issues, layoffs, and pending disability retirement, every reassignment initiated and required by the department would be voluntary if the employee complied by moving to the new position, even if the employee fervently wished to remain in the current position and expressed that desire.

29.

Under this theory, the only involuntary transfers, and the only ones not permitted by past practice, would be those that resulted in a deputy filing a grievance. The evidence was undisputed, however, that no deputy before Isaac and Alstrom had ever filed a grievance when told to find a new home. Consequently, there was no evidence of an established past practice that the department would not make involuntary transfers, with the term "involuntary transfer" defined as a transfer the deputy challenged by filing a grievance.

Thus, substantial evidence did not establish an unequivocal and clearly enunciated past practice that the department would not make involuntary transfers in the absence of a disciplinary action, documented performance issue, layoff, or pending disability retirement.

### b. Readily ascertainable and accepted by both parties

According to PERB, a binding past practice must not only be unequivocal and clearly enunciated, it must also be acted upon by the parties and "readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties." In determining whether substantial evidence supported the existence of a past practice that was ascertainable, fixed and established, and accepted by both parties, we look to the facts to which the witnesses testified, not to the witnesses' or the attorneys' characterizations of those facts. That is, we look at the facts surrounding the reassignments and how they were accomplished, not at characterizations, such as voluntary, involuntary, agreed, acquiesced, or capitulated.

Initially we note there was no evidence that, over some reasonably long period of time, the only transfers actually made, other than those initiated by the deputy by his or her own choice, were those based on disciplinary matters, documented performance issues, layoffs, or a pending disability retirement. Rather, there was undisputed evidence that some deputies were told they were going to be transferred or they needed to find a new position, and they were subsequently transferred. There was no evidence the department asked these deputies for their consent to the reassignment, or declined to

30.

reassign them if they did not consent or capitulate. The testimony was that the deputies were not given a choice regarding whether they would be transferred or not. The only choice they were given was whether they would return to patrol or apply for another specialty assignment.

Lieutenant Ko testified he believed he could not transfer a deputy out of a specialty unit unless he had cause. A deputy could be transferred based on performance or disciplinary action, or if the deputy had a special skill that would be useful in a particular unit. Lieutenant Ko stated his belief that deputies could be reassigned only for cause was based on discussions he had with the former undersheriff. Inconsistently, however, Lieutenant Ko testified that, four or five years previously, he had thought it might be time to move a deputy, John Avila, from his assignment in narcotics (in the Special Investigations Division), because Avila had been there 20 years and it might be time to give others an opportunity to join the unit. The former undersheriff would not let Lieutenant Ko transfer Avila, because Avila's contacts made him a valuable asset to the unit. Notably, despite his professed belief he could not transfer deputies without cause, Lieutenant Ko proposed reassigning Avila simply because he had been in the unit a long time (the same reason given for Isaac's and Alstrom's reassignments), not for disciplinary or performance reasons. Further, the undersheriff opposed the reassignment because of Avila's political connections and the value of his contacts with the state, not because of any department policy or practice that prohibited involuntary transfers not based on discipline or performance.

Lieutenant Ko also acknowledged that other supervisors have told their deputies that it is time for them to find a new home, and the deputies have moved to other areas.

Schmidt testified that the department could transfer a deputy out of a specialty assignment based on discipline, documented performance issues, loss of funding for the position, layoffs, and promotions. If a supervisor did not want a particular deputy in the unit, there was no mechanism for transferring the deputy. If the deputy refused to leave

31.

the unit, there was nothing the supervisor could do. Schmidt conceded, however, that he had heard of situations in which a supervisor told a deputy it was time for the deputy to move on, to find another place to go, and the deputy moved back to patrol or applied for a position in another specialty unit. He acknowledged this had been going on for years.

Schmidt also testified that, before the current grievance was filed, if a deputy was told to leave a specialty assignment but did not want to go, the deputy had a right to stay in that position. He based this conclusion solely on the fact that no deputy, prior to Isaac and Alstrom, had come to him, as the employee representative, and complained of being forced out of a specialty assignment. Schmidt did not testify to any instance in which a deputy was told he was being reassigned, but was allowed to remain because the deputy asserted a right to refuse to be reassigned.

Schmidt also testified Captain Horton told him she was not going to reassign deputies without disciplinary reasons. While this may have been her expressed intent, there was no evidence she believed she lacked the authority to make reassignments for other reasons. There also was no evidence of her actual actions or practice; there was no evidence that, during her tenure as patrol captain, the department did not initiate any reassignments of deputies out of their specialty assignments against their wishes, for reasons other than disciplinary issues.

There was evidence the department reassigned several deputies who did not wish to be reassigned; there was no evidence they complained to Schmidt. The evidence indicated Lyman, Plann, Sims, Quintanilla, Rodriguez, and Valassis were transferred out of their specialty assignments; these deputies did not initiate the transfers.[6] They were told by their supervisors that it was time to move, they needed to leave, or they needed to find a new home. None of these reassignments were based on discipline, documented

---

[6] There was conflicting evidence regarding Sims. Schmidt testified Sims requested the transfer and wanted to transfer. Captain Gularte, who was in Sims's chain of command, testified Sims did not request the transfer. Sims's sergeant told Sims it was time to leave because the unit was being restructured; he gave Sims no choice about transferring.

performance issues, layoffs, or pending disability retirement. The evidence indicated the deputies did not wish to leave their specialty assignments but were not given the option of remaining.[7] They complied with the department's reassignment by participating in the annual seniority sign-ups for patrol or choosing a patrol shift prior to the annual sign-ups.

The arbitrator appeared to be distracted by testimony referring to bullying.[8] The grievance did not raise any issue of bullying deputies out of their specialty positions. Isaac and Alstrom did not contend they were subjected to bullying, and there was no evidence that they were. Some witnesses made general statements that they had heard of bullying, but there was no specific evidence identifying any deputy who had actually been bullied and had left a specialty unit position as a result. The testimony consisted of rumor (what the witness "heard") and speculation (about what a supervisor hypothetically could or might do). Although Plann testified his supervisor threatened to make his life miserable, he did not claim he was actually subjected to bullying. Further, there was no evidence Lyman, Sims, Quintanilla, Rodriguez, or Valassis was threatened or subjected to bullying. They were told they were being transferred, and they were transferred.

We conclude the administrative record does not contain substantial evidence— evidence that is reasonable in nature, credible, and of solid value—that supports a

---

[7] The exception was Valassis. The only evidence regarding Valassis was testimony he was involuntarily reassigned. There was no specific testimony that he wished to remain in his position.

[8] The arbitrator seemed to be concerned about what the policies and practices of the department should be, rather than what they were proven to be. The decision included these statements: "In the considered opinion of the arbitrator, the rights and obligations of the [department] and the rights and obligations of the employees who provide service to the public under the Sheriff[']s direction must be free of a systemless action, which may appear to those at the receiving end as being a 'bullying' decision.… Any comment from representatives of management, who are identified as having an attitude reflecting that an involuntary reassignment would take place regardless of a deputy's assent is, in the considered opinion of the arbitrator, detrimental to the spirit of positive labor/management relations." Also, "within the working environment in which the law enforcement employees perform their services it is essential that the staff be free of potential bullying, including the avoidance of inside or outside political decision making [*sic*]."

conclusion that the department had an unequivocal, clearly enunciated and acted upon, readily ascertainable, long-term, fixed and established past practice, accepted by both parties, of reassigning deputies out of their specialty assignments only based on disciplinary issues, documented performance issues, layoffs, or pending disability retirement. The finding of the arbitrator that a binding past practice existed is unsupported by the record.

### D. Unilateral change in past practice

To prevail on a complaint that an employer made an illegal unilateral change to an established past practice, an employee or employee representative must establish that the employer changed its practice. There was no substantial evidence of a change in the department's practice.

The evidence presented in the administrative proceeding indicated that several deputies, who did not wish to leave their specialty units, had been reassigned out of their specialty units after their supervisors told them they would be transferred or they needed to find a new home. Isaac and Alstrom testified they were aware of deputies whose supervisors told them they needed to leave their specialty units, and they did leave. They acknowledged that these reassignments were not really voluntary; the deputies were not given a choice. Alstrom acknowledged this happened many times over the years.

Appellants attempted to distinguish other deputies' experiences from the experiences of Isaac and Alstrom by asserting the other deputies ultimately agreed to, acquiesced in, or capitulated to the reassignment, and by labeling their reassignments "voluntary." Appellants claim Isaac's and Alstrom's reassignments were different, because they never agreed or capitulated, and instead filed a grievance to fight the reassignments.

Ignoring labels, such as voluntary, involuntary, and capitulation, and looking only at the facts surrounding the reassignments, appellants concede the department's past practice of making reassignments included telling deputies they needed to find a new

34.

home or were being reassigned, after which the deputies were reassigned to patrol or another specialty assignment. Isaac and Alstrom, like Lyman, Plann, Sims, Quintanilla, Rodriguez, and Valassis, were told they were being reassigned, had the option of applying for another specialty assignment, were given the opportunity to sign up for a patrol position during the annual shift sign-ups based on their seniority, and were not given the choice of remaining in their specialty units. They all eventually selected a patrol assignment. The only difference between the experiences of Isaac and Alstrom and the experiences of the other deputies was that Isaac and Alstrom filed a grievance to challenge their reassignments. Thus, there was no change in the department's actions from what it had done in the past. The only difference was the employees' reaction to it: they filed a grievance. Consequently, substantial evidence does not support a finding that the department made a unilateral change in its own established past practice when it reassigned Isaac and Alstrom out of their specialty assignments and back to patrol against their wishes.

## DISPOSITION

The trial court judgment granting the petition for writ of mandate and vacating the arbitrator's decision is affirmed. The county is entitled to its costs on appeal.

_____

HILL, P.J.

WE CONCUR:

_____

SMITH, J.

_____

MEEHAN, J.

35.

Filed 6/26/20

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF FRESNO,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRESNO DEPUTY SHERIFF'S ASSOCIATION et al.,<br><br>    Defendants and Appellants. | F076417<br><br>(Fresno Super. Ct. No. 15CECG02375)<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION** |

On June 18, 2020, this court received and filed a request for publication of the nonpublished opinion filed on May 29, 2020, in the above-entitled matter.  It appearing that part of the nonpublished opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of part IV.C. and D. of the Discussion.

_____

HILL, P.J.

WE CONCUR:


_____

SMITH, J.


_____

MEEHAN, J.